965 P.2d 76

ESTATE OF Ethel CRAIN; Charles Doleshal; Harry Matson; Susan Cureton; Sharon Shilling; Grand Canyon Business Center, L.L.C., Plaintiffs–Appellants,

v.

CITY OF WILLIAMS; Calder W. Chapman and Jane Doe Chapman; Buford Belgard and Jane Doe Belgard; Don Dent and Jane Doe Dent; Kathie Craig and John Doe Craig; K. Edes and Jane Doe Edes; Jan Wellman and Jane Doe Wellman, Defendants–Appellees.

No. 1 CA–CV 97–0450.

Court of Appeals of Arizona,
Division 1, Department B.

April 14, 1998.

Review Denied Oct. 20, 1998.

Law Office of John G. Gliege by John G. Gliege, Flagstaff, for Defendants-Appellants.

Margrave, Celmins & Verburg by Gary Verburg, Scottsdale, for Plaintiff-Appellee.

## OPINION

EHRLICH, Judge.

¶ 1 Ethel Crain, Charles Doleshal, Harry Matson, Susan Cureton, Sharon Shilling and Grand Canyon Business Center ("appellants"), owners of real property within the City of Williams' Northside Sewer Improvement District No. 2, challenge the legality of assessments levied against their property by the city. For the reasons which follow, we affirm the summary judgment in favor of the City of Williams.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Following a review of the city's future sewer needs, the City of Williams' city council, on December 16, 1993, adopted a resolu-tion declaring its intention to improve the sewer line running through an area with potential for commercial development known as the Northside Sewer Improvement District No. 2. A hearing was held at which the council considered one protest against the improvements and one objection regarding the extent of the district. The council determined that the objection and protest were insufficient, and it ordered work on the project to begin.

¶ 3 Following the award of the construction contract, several district property owners objected to the assessment diagram and methodology. After a hearing, the city council rejected the objections and approved both the diagram and method of assessment by resolution on June 9, 1994. Assessments were levied and recorded on August 2, 1994, resulting in liens on those district lots with unpaid assessments. *See* ARIZ.REV.STAT. ANN. ("A.R.S.") § 48–589(H) (1988). On October 26, 1995, following the completion of the improvement project, the city heard objections on the recapitulated assessment amounts and approved those amounts on the same date.[1]

¶ 4 The property owners sought relief in superior court. The trial court granted the city's motion for summary judgment, finding that the owners had failed to present evidence that the city's apportionment of assessments was either fraudulent, arbitrary or discriminatory.

## DISCUSSION

¶ 5 On appeal, the property owners argue that the city violated A.R.S. section 48–589(C) (1988) and its own resolution when it imposed assessments that were disproportionate to the benefits received by each lot.[2]

---

1. When the assessment is dated before the work is completed, a recapitulated assessment must be filed after the completion of the work based on the actual costs of the project. A.R.S. § 48–590(F) (1988).

2. Consistent with A.R.S. section 48–589(C) (1988), the city council's Resolution of Intention to Order Improvement No. 932, section 2, provides in relevant part:
   (B) The City shall not assess the costs and expenses of the Improvements which are for the general public benefit against the respec-tive lots, pieces and parcels of land located within the boundaries of the Improvement District, and if a portion of the costs and expenses of the Improvements is for the general public benefit, the City shall assess the respective lots, pieces and parcels of land located within the boundaries of the Improvement District only that portion of such costs and expenses which benefits the lots, pieces and parcels of land located within the boundaries of the Improvement District.
   We confine our discussion to whether the assessments imposed on the property owners are in

They argue that they have been assessed for general benefits that are conferred upon property located outside the district. They also claim that the statutory lien-creating process amounts to an unconstitutional taking of their property. In addition, Harry Matson and Susan Cureton contend that they should not be subject to the assessments because their parcels are near a pre-existing sewer line.

### A. Proportionality of Assessments

■ ¶ 6 A property owner within an improvement district may be assessed in proportion to the special benefit secured by that property; assessments cannot be levied for general benefits which the owner receives in common with the community at large. *City of Globe v. Willis,* 16 Ariz. 378, 391–92, 146 P. 544, 548–49 (1915); A.R.S. §§ 48–576(B) (1988) and 48–589(C). The determination whether property within an improvement district derives a special benefit for assessment purposes is a legislative function of the city council. *Moore v. City of Chandler,* 148 Ariz. 124, 128, 713 P.2d 325, 329 (App.1985). As such, the correctness of that determination is conclusive, and our standard of review is limited to "whether the common council's opinion is supportable, that is, not arbitrary, fraudulent or discriminatory." *Conyers v. City of Prescott,* 182 Ariz. 336, 338, 897 P.2d 638, 640 (App.1994) (internal quotation marks and citations omitted).

■ ¶ 7 The city council duly adopted a resolution declaring the city's intention to begin work on an improved sewer system in Northside Sewer Improvement District No. 2. As reflected in the resolution, the mayor and council determined that property within the district would receive a special benefit and thus should bear the costs of the improvements:

> *Section 2.* (A) The Improvements, in the opinion of the Mayor and Council of the City, are of more than local or ordinary public benefit and are of special benefit to the respective lots, pieces and parcels of

land within [the improvement district], and the Mayor and Council of the City hereby make and order the cost and expense of the Improvements chargeable upon [the improvement district]. . . .

We turn to the record to determine whether it supports the council's opinion that the owners' shares of the total assessment are proportional to the special benefits their parcels receive from the improvements. We focus on the council's determination of district boundaries and the methodology it used in making assessments.

¶ 8 The city defined the improvement district boundaries after considering a number of potential routes for the new sewer line and after projecting the potential for commercial development of the affected property. It settled on the district boundaries with the goal of allowing those properties to be developed to their highest and best use. The improvement district included properties which abutted the new sewer line, either directly or through common ownership.

¶ 9 After rejecting methodologies for assessment based on front footage and total area, the city selected a methodology based on per-acre sewage generation. The city's former manager explained the choice:

> This methodology was selected as being the most equitable, since it considered the area of the property served, as well as the impact of future uses on the sewer system. To calculate these assessments, the City engineer established a list of potential land use categories, and assigned each one with a per-acre sewage generation factor, based on accepted engineering standards. Working together with the Community Development Department, the zoning ordinance and comprehensive plan were utilized to categorize each property within the [improvement district] according to the highest, best and most appropriate use.

¶ 10 The assessment diagram indicates that each of appellants' parcels is served by the expanded sewer line, a system which is

---

conformity with the proportionality requirement of A.R.S. section 48–589(C):

the superintendent shall assess the total sum [due for the work of the improvement project]

upon the several lots [within the improvement district], each respectively in proportion to the benefits to be received by each lot.

capable of handling commercial sewage generation. We agree with the trial court that the city council's determination of the district boundaries and its selection of assessment methodology represent reasonable bases for levying assessments. Indeed, all but one of the parcels at issue have increased in value to an extent that exceeds the corresponding amount of assessment. The council's actions were based on rational considerations and were neither arbitrary, fraudulent nor discriminatory.

¶ 11 Appellants claim, however, that the assessments are unlawful because the district property owners must pay for benefits received by property owners outside the district.[3] They allege that a number of facts indicate that the improved system was designed to serve the community at large: The original scope of the improvement district encompassed 3600 acres, an area much larger than the final district, and the flow capacity of the sewer line exceeds what is necessary for the parcels within the district.[4] However, as noted by the former city manager, Matt Winkel, the expanded plan was rejected after the city gave careful consideration to the potential for commercial development and alternative methods for sewage for the area outside the district. It is not our role to say that reducing the size of the district and constructing an oversized sewer line is not responsible planning, and we will

not infer a discriminatory assessment based on appellants' speculation that the area may be expanded and that the full capacity of the line may be used by others outside the district sometime in the future.

¶ 12 Appellants also list the city's adoption of a recapture ordinance as proof of its "knowledge of the fact that the property being assessed is not the only property subject to service by the sewer." The recapture ordinance simply sets forth a plan to recover the costs of expanding the improved sewer line to serve additional parcels or property should the need to do so arise in the future. The ordinance includes a plan whereby future users of the sewer line who are not located within the district must pay a participation charge to the district property owners. Indeed, the ordinance represents the type of accountability that the owners claim is missing in the city's improvement plan. The city's adoption of the ordinance does not indicate a discriminatory assessment on the district property owners.

¶ 13 The record provides ample support for the city council's determination that the improvements are of special benefit to property within the district and were not designed to serve the community at large. The city manager, Jan Wellman, stated that the issue of extending the sewer service beyond

---

3. The city responds that, having failed to make a timely objection regarding the size of the district at the "Notice of Intention" stage of the proceedings, appellants have waived the argument on appeal. Matson testified that he objected to the proposed improvement but withdrew his objection before the first hearing. However, the record shows that the city council considered one protest against the improvements and one objection regarding the extent of the district at the initial hearing. Furthermore, A.R.S. section 48–584(E) (1988) provides that objections relating to the legality of the council's previous acts will be considered at the second stage of the proceedings if filed within 15 days of publication of the award of the construction contract:

> [A]ny person having an interest in a lot liable to assessment, claiming that any of the previous acts or proceedings relating to the improvements are irregular, illegal or faulty, may file with the clerk a written notice specifying in what respect the acts and proceedings are irregular, illegal or faulty, and all objections to any act or proceeding which are not made

> prior to the notice of award shall be waived, except as to matters directly affecting the authority of the governing body.

The city does not dispute that objections were raised at this second "Notice of Award" stage of the proceedings. We therefore will accept that appellants have not waived any argument relating to the size of the district.

4. Among these facts, appellants claim that the connection of the Rodeway Inn to the improved system and that the property was not assessed for its share of the costs establish that the assessments on the district property owners are unlawful. They cite to their Appendix 2 as support for this fact. Appendix 2, however, does not show the location of the motel, and the city water superintendent, Ron Stillwell, stated in an affidavit that the motel was not connected to the improvement district sewer line. Accordingly, because appellants have failed to cite to a supporting part of the record, we decline to address this argument. See ARIZ. R. CIV.APP. P. 13(a)(6); State Farm v. Novak, 167 Ariz. 363, 370, 807 P.2d 531, 538 (App.1990).

the boundaries of the district was not contemplated. He testified that the new line was designed "to serve the full build out of the district at maximum capacity, maximum land use, maximum flows" and that the benefit from the improvement is "exclusively to the members of the district."

¶ 14 We agree with the trial court that the city council's determination of assessments will not be invalidated simply because the general public may receive incidental benefits from the improvement. The record reasonably supports the council's conclusion that appellants' shares of the assessment are proportional to the benefits each receives from the project.[5]

### B. Pre-existing Sewer Service to the Matson and Cureton Parcels

¶ 15 Matson and Cureton contend that they should not be subject to the assessment because their parcels are located near pre-existing sewer facilities. They cite A.R.S. section 48–576(A) (1988), which provides in relevant part: "If the work proposed is already done for a lot, the lot shall be excepted from the assessment therefor to the extent of the work done." Resolution of this issue turns on whether the work involved in building the new sewer system was "already done" for the Matson and Cureton lots when the pre-existing sewer line was installed.

¶ 16 The improved sewer system differs from the pre-existing system in both design and location. The water superintendent of the city, Ron Stillwell, stated in an affidavit that the existing sewer line did not run parallel to the Cureton property. He further avowed that the closest sewer line to the Cureton property is located at a perpendicular point across the street from the parcel, that it was only a four-inch-diameter line and that it was already at or near capacity. A city contract engineer, Richard Aldredge, confirmed the superintendent's facts and noted that the pre-existing lines would not be able to handle commercial development. An-

other city official testified that the pre-existing line could accommodate a single family home.

¶ 17 Similarly, the city's pre-existing sewer infrastructure does not run parallel to the Matson parcel, and the closest point on the line lies approximately 250 to 300 feet from that lot. In contrast, the improved system runs the entire length of the Matson property's southern border. In addition, the new sewer line is 24 inches in diameter at some points, extends along one side of the Cureton property and was designed for "intensive commercial uses" to handle the capacity of "full build out and maximum usage of the land and sewer line."

¶ 18 Because the improvement project duplicated neither the design, purpose nor location of the pre-existing sewer system, the statutory exception does not apply.

¶ 19 Matson and Cureton argue that the city is obligated to provide the appropriate infrastructure to meet each parcel's future needs because it already provides sewer service from the pre-existing line. They rely on the decision in *Travaini v. Maricopa County*, 9 Ariz.App. 228, 450 P.2d 1021 (1969), for the proposition that the city must remedy any inadequacy in the pre-existing service at its own expense. In *Travaini*, this court held that a municipality cannot unreasonably deny an abutting property owner access to a pre-existing sewer line. *Id.* at 229–30, 450 P.2d at 1022–23. The case did not involve the issue of special assessments. Because neither Matson nor Cureton has requested access to the pre-existing sewer line, we find *Travaini* inapposite.

### C. Constitutionality of the Statutory Lien-creating Process

¶ 20 Appellants claim that they were not afforded a meaningful opportunity to be heard regarding the assessment prior to the creation of liens upon their properties. They argue that having to wait fifteen months from the date the liens were created

---

5. Appellants list other support for their claim that they have been assessed for benefits which inure to property owners outside the district. We decline to find a discriminatory assessment scheme based on appellants' recitation of facts which have speculative significance at best. Indeed, they failed to provide an example where unassessed property lying outside the improvement district is benefitted by the work.

before having an opportunity to object to the imposition of the liens constitutes a taking of their property without due process of law in violation of the United States and Arizona constitutions.[6]

¶ 21 Due process requires that interested persons be given an opportunity to be heard on all phases of the lien-creating process. *Henningson, Durham & Richardson v. Prochnow,* 13 Ariz.App. 411, 416, 477 P.2d 285, 290 (1970). The statutes governing general public improvements provide affected parties with three opportunities to dispute aspects of the legality of special assessments: At the initial stage of the proceedings, a hearing must be held to address any properly-filed objection regarding "the extent of the district to be assessed to pay the expenses of the improvement." A.R.S. § 48–579(C)–(E) (1988). Property owners have a second opportunity to object following the publication of the award of the construction contract. A.R.S. § 48–584(E). If properly filed, an objection may address the legality of any "previous acts or proceedings relating to the improvements...." A.R.S. § 48–584(E). Finally, affected persons have an opportunity to object and be heard on "the legality of the assessment or to any of the previous proceedings connected therewith" following the completion of the work and imposition of assessments. A.R.S. § 48–590(F), (G) (1988). They may again raise the legality of any previous act relating to the assessments at this final hearing. A.R.S. § 48–590(G).

¶ 22 In this case, objections were considered at each stage of the process. Implicit in appellants' argument is that they were not provided a meaningful opportunity at the second stage of the proceedings to be heard regarding the creation of the liens against their property. Objections were considered at this second stage regarding the assessment diagram and the method of assessment. Appellants were on statutory notice that following approval of the assessments by the city council, those assessments would be recorded along with a warrant, thus creating a

lien upon the lots assessed. A.R.S. § 48–589(H) ("When so recorded, the several amounts assessed shall be a lien upon the lots assessed for a period terminating on the date the assessment against the respective lot is paid in full...."). The substance of the lien-creating process, therefore, was at issue when appellants objected at the second stage of the proceedings. The fifteen months that intervened before they could be heard a second time regarding the creation of the liens does not amount to a denial of due process.

¶ 23 The supreme court stated: " 'It is enough [for purposes of due process of law] that a hearing is permitted before the imposition of the assessment as a charge upon the land or in proceedings for collection afterwards.' " *Wahl v. Hart,* 85 Ariz. 85, 89, 332 P.2d 195, 197 (1958) (discussing a previous version of the statutory scheme authorizing the creation of improvement districts) (quoting *Utley v. City of St. Petersburg,* 292 U.S. 106, 109, 54 S.Ct. 593, 595, 78 L.Ed. 1155 (1934) (citations omitted)); *see also Hinz v. City of Phoenix,* 118 Ariz. 161, 164, 575 P.2d 360, 363 (App.1978) (statutes setting forth procedures for manner of payment of assessments following the creation of improvement lien comply with due process because what is required is "opportunity to be heard *on* all phases of the lien creating process but not necessarily *at* all phases"). Appellants had an opportunity both before and after creation of the liens to be heard on the issue. We find no violation of their constitutional rights.

### CONCLUSION

¶ 24 For the foregoing reasons, we affirm the summary judgment in favor of the City of Williams.

GERBER and TOCI, JJ., concur.

---

**6.** The levying of special assessments is an exercise of the power of taxation, not the power of eminent domain. *Home Builders Ass'n of Central Ariz. v. City of Scottsdale,* 183 Ariz. 243, 246, 902 P.2d 1347, 1350 (App.1995), *aff'd,* 187 Ariz. 479,

930 P.2d 993, *cert. denied,* —— U.S. ——, 117 S.Ct. 2512, 138 L.Ed.2d 1015 (1997). Accordingly, we confine our analysis to whether the statutory hearing process results in a violation of appellants' rights to due process of law.