IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**SOUTHERN ARIZONA HOME BUILDERS ASSOCIATION,**
*Plaintiff/Appellant,*

*v.*

**TOWN OF MARANA,**
*Defendant/Appellee.*

———————

No. CV-21-0211-PR
Filed January 17, 2023

———————

Appeal from the Superior Court in Pima County
The Honorable Paul E. Tang, Judge
No. C20184411
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division Two
252 Ariz. 83 (App. 2021)
**VACATED**

———————

COUNSEL:

Kevin E. O'Malley, Mark A. Fuller (argued), Gallagher & Kennedy, P.A.,
Phoenix, Attorneys for Southern Arizona Home Builders Association

Andrew J. Petersen (argued), Humphrey & Petersen, P.C., Tucson, and
Frank Cassidy, Frank Cassidy, P.C., Tucson, Attorneys for Town of Marana

Eileen Dennis GilBride, Jones, Skelton & Hochuli, P.L.C., Phoenix,
Attorneys for Amicus Curiae Home Builders Association of Central
Arizona

Nancy L. Davidson, General Counsel, League of Arizona Cities and Towns,
Phoenix, Attorney for Amicus Curiae League of Arizona Cities and Towns

———————

JUSTICE BOLICK authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER and JUSTICES LOPEZ, BEENE, MONTGOMERY, and PELANDER (RETIRED) joined.*

_____

JUSTICE BOLICK, Opinion of the Court:

¶1 We hold in this case that the Town of Marana violated A.R.S. § 9-463.05 by assigning the entire cost of upgraded and expanded wastewater treatment facilities to future homeowners through development impact fees. Because the statute governing development fees was substantially changed following our seminal decision applying its prior provisions, *Home Builders Association of Central Arizona v. City of Scottsdale*, 187 Ariz. 479 (1997), we interpret the statute afresh in light of the revised statute's significant constraints on and requirements for the imposition of such fees.

## BACKGROUND

¶2 Before approving new development, municipal governments must assure they have an adequate 100-year water supply. A.R.S. § 45-576(B), (L).

¶3 Until 2012, Pima County provided sewer and water service to residents of the Town of Marana ("Town"). That year, the Town obtained operational control over a wastewater reclamation facility ("WRF") from Pima County, assuming the approximately $16.4 million outstanding debt on the facility. As acquired, the WRF's tertiary treatment system's capacity was 3.5 million gallons-per-day ("gpd").[1] However, the WRF's functional capacity was limited by the secondary treatment system's maximum capacity of 380,000 gpd.

_____

[1] The tertiary treatment stage, which consists of a sand filtration and ultraviolet disinfection system, is used to further treat the wastewater following the secondary treatment.

_____

* Justice King is recused from this matter. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

2

¶4 In 2013, the Town acquired legal title to the WRF, including the infrastructure, land, and exclusive rights to the facility's effluent. As acquired, the Town's residents fully utilized WRF's operational capacity of 380,000 gpd. The Town improved the secondary treatment system to expand the WRF's output to 500,000 gpd.

¶5 Owning a facility's effluent contributes to the 100-year assured water supply required for new development, as it can be used to "recharge" the aquifer. Recharging, or replenishing, qualifies the Town to obtain "recharge credits" that help demonstrate an adequate long-term water supply. A.R.S. § 45-855.01 ("the director shall include the amount of long-term storage credits . . . in determining . . . whether to designate the city, town or private water company as having an adequate water supply"); A.R.S. § 45-852.01(C)(1) (laying out a framework for the director to grant water storage credits for recharging an aquifer under certain conditions). Effluent rights to recharge the aquifer are so valuable to the Town, in fact, that it had been trying to acquire the WRF since 2007. The acquisition here provided a more efficient closed loop water system because reclaimed water is added back to the aquifer rather than purchased from Central Arizona Project. The Town estimated this would produce $350,000 in annual savings as early as 2018.

¶6 In 2013, the Town issued twenty-year bonds with an annual debt service of $1.8 million to finance the acquisition of the WRF. The Town also commissioned two infrastructure improvement plans ("IIPs"). An IIP is required before a municipality may assess fees like the ones at issue here. *See* § 9-463.05. Pursuant to the IIPs, half the acquisition costs were assigned to future water customers and half to future sewer customers in the form of development impact fees. *Infra* ¶ 10. None of the costs were assigned to existing users.

¶7 In 2017, the Town approved a Capital Improvement Project encompassing "multi-phase expansion and upgrades" to the water and sewer systems. At issue here is Phase 1, which was completed and became operational in 2018. The Town contends that the ultimate cost of Phase 1 was higher than projected in the Master Plan—around $23 million, not including design—however, the Town used the projected cost of $17.5 million as the basis for assessing the impact fees being challenged here.

¶8          Phase 1 encompassed multiple components.  To increase the WRF's capacity to 1.5 million gpd to serve both existing residents and anticipated development, a new influent sewer main, a new headworks facility, and higher capacity influent pumps were installed at a projected cost of $982,800.  Other new facilities built during the Phase 1 expansion included a new secondary treatment system at a projected cost of $4,047,600, two secondary clarifiers at a projected cost of $3,047,300, and a new solids handling facility at a projected cost of $1,615,700.

¶9          The upgraded secondary treatment system was necessary to bring the Town into compliance with the Class B+ water quality standard required by its Aquifer Protection Permit.  In 2017, the proposal for the new upgraded secondary treatment system triggered an Arizona Department of Environmental Quality ("ADEQ") requirement that the Town produce the highest quality water, Class A+, based on the best available technology. The new system included two secondary clarifiers that settle out the solids in the liquid after the secondary treatment and send treated effluent to the existing downstream processes of final filtration and disinfection, which helps the system operate more efficiently.  The new solids handling facility also eliminated the need to pay a third-party contractor to haul away sludge, saving residents about $400,000 annually.  Through these upgrades, the new system improved water quality from barely meeting the Class B+ standard to Class A+ quality.  The Class A+ water has re-use possibilities that Class B+ water did not have, such as improved crop irrigation, residential landscape irrigation, fire protection systems, and vineyard spray irrigation.

¶10          In 2017, the Town adopted new water and sewer impact fees in conjunction with the Capital Improvement Project, effectively replacing the 2013 development fees.  The Town again assigned 100% of the debt service to future water and sewer customers via development impact fees. To account for the contributions made by the then-current customers for the existing utilized capacity, the Town contributed $3.2 million, which it received from a refund from an unrelated 2004 bond offering, toward financing the WRF and Phase 1.

¶11          In 2018, Southern Arizona Home Builders Association ("SAHBA") filed this declaratory judgment action against the Town. SAHBA argued that the development fees violated § 9-463.05 because they

4

disproportionately imposed 100% of the cost of the WRF and Phase 1 expenses on new development despite those facilities also benefitting current residents by enabling a higher level of service and saving taxpayer money. The Town argued the development fees were valid because the expansion and improvements were undertaken to serve future development.

¶12          The trial court granted summary judgment in favor of the Town. Applying *City of Scottsdale*, 187 Ariz. at 482, the court ruled that the development impact fees bear "a presumption of validity, such which may be overturned *only* if SAHBA establishes the restrictions to be 'arbitrary and without a rational relation to a legitimate state interest.'" The court concluded that "the Town's chief goal in acquiring the WRF was to obtain its effluent as a water resource in order to secure recharge credits towards water rights as a means for sustaining growth by having access to a 100-year designated water supply." Although acknowledging that "[t]here can be no question that this goal benefits current residents along with those arriving in the future," the court concluded that § 9-463.05 was satisfied because the development fees "result in a beneficial use to the development." (citing § 9-463.05(B)(1)).

¶13          The court of appeals affirmed. *S. Ariz. Home Builders Ass'n v. Town of Marana,* 252 Ariz. 83, 84 ¶ 1 (App. 2021). Like the trial court, the court of appeals applied *City of Scottsdale* and its presumption of validity, *id.* at 86 ¶ 10 & n.2, and concluded that SAHBA "has not shown" that the project increased the level of service to existing development. *Id.* ¶ 11. The court held that because the "upgrades and modernization to the WRF," *id.* at 88 ¶ 16, were "undertaken for the existential benefit of new development," *id.* at 89 ¶ 18, the fact that the project also "happens to serve existing development as well" does not render the imposition of the entire cost upon new development unlawful under § 9-463.05, *id.* at 88 ¶ 16.

¶14          We granted review of whether the Town violated § 9-463.05 by (1) making future development bear 100% of the cost of acquiring the WRF facility; (2) making future development bear nearly all the cost of upgrading, modernizing, and improving the facility; and (3) failing to take into account what could or could not be included in development fees under that statute, and to make any proportionate allocation of costs

between existing and future development.  Because these issues present overlapping facts, issues, and legal principles, we consider them together.

¶15        This case presents unresolved issues of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶16        We review de novo a grant of summary judgment, "viewing the evidence in the light most favorable to the party against whom summary judgment was entered."  *Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 267 ¶ 10 (2021).  We also review matters of statutory interpretation de novo.  *State v. Jones*, 246 Ariz. 452, 454 ¶ 5 (2019).  "Our task in statutory construction is to effectuate the text if it is clear and unambiguous."  *BSI Holdings, LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 19 ¶ 9 (2018).  "Words in statutes should be read in context in determining their meaning."  *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017).

A.        A.R.S. § 9-463.05, Old and New.

¶17        Section 9-463.05 was first enacted in 1982, authorizing municipal governments to "assess development fees to offset costs to the municipality associated with providing necessary public services to a development."  A.R.S. § 9-463.05(A) (2011).  The main constraint was that the development fees "shall result in a beneficial use to the development," § 9-463.05(B)(1), and that "[t]he amount . . . must bear a reasonable relationship to the burden imposed on the municipality to provide additional necessary public services to the development," § 9-463.05(B)(4).[2]

¶18        In *City of Scottsdale*, the Court considered a challenge to a water resources development fee on the basis that the city's plans to acquire new water were too speculative to confer a beneficial use upon new development, as required by the then-operative version of § 9-463.05.  187 Ariz. at 480, 483.  This Court noted that the adoption of the fee "was a legislative act that came to the court cloaked with a presumption of validity."  *Id.* at 482.  As applied by the Court, the presumption meant "first,

---

[2] References to § 9-463.05 in paragraphs 17 through 20 are to the statute as it existed in 2011; all other references are to the current version.

that the factual underpinning for the city council's decision, *i.e.,* that the city needed more water, must stand unless shown to be without factual support"; and second, "that the wisdom of Scottsdale's choice of methods of meeting its water needs is a legislative, not a judicial, question." *Id.* The Court rejected plaintiff Home Builders Association's argument that Scottsdale's water plans were too speculative, holding that "it need only develop such plans as will indicate a good faith intent to use development fees to provide those services within a reasonable time." *Id.* at 484.

**¶19** Turning to the statute's "reasonable relationship" requirement, the Court stated that the plaintiff had "the burden of showing that Scottsdale's fee bore no reasonable relationship to the public burden created by the proposed development." *Id.* at 485. The Court applied a two-part test for assessing the validity of these fees: (1) that "the exaction imposed on the developer be factually related to the need for public services created by the proposed development"; and (2) that "the nature and extent of the exaction must bear a reasonable relationship to that portion of the public burden created by the proposed development." *Id.* at 483. But the Court concluded that because the plaintiff did not challenge the amount of the fee, remand to the trial court to apply this standard was unnecessary. *Id.* at 485.

**¶20** The Court decided the case against the backdrop of *Dolan v. City of Tigard*, 512 U.S. 374 (1994), in which the United States Supreme Court had held that under the takings clause of the Fifth Amendment, an exaction imposed upon an individual landowner as a condition of development must be related both in nature and extent to the proposed development's burden on the community. *Id.* at 391. The necessary relationship required by the Fifth Amendment is "rough proportionality." *Id*. The *City of Scottsdale* Court noted that the Supreme Court's term "rough proportionality" was adopted rather than a reasonable relationship test because the term "reasonable relationship" is confusingly similar to the term "rational basis," which describes a standard of minimum scrutiny. 187 Ariz. at 485; *Dolan*, 512 U.S. at 391. But this Court held that *Dolan* was inapplicable because Home Builders Association did not argue that "there was no reasonable relationship between the amount of the fee and the community burden." *City of Scottsdale,* 187 Ariz. at 485–86.

**¶21** In 2011, the legislature largely transformed § 9-463.05, amending all but two subparagraphs of the then-existing statute, and adding more than ten pages of new provisions. 2011 Ariz. Sess. Laws ch. 243, § 1 (1st Reg. Sess.). The new statute is about four times as long as the previous version and consists primarily of procedural requirements and substantive limits on the imposition of development fees.

**¶22** Perhaps the most noteworthy statutory changes were the removal of the "reasonable relationship" standard from the previous § 9-463.05(B)(4), and the new requirement that development fees must not be "used to impose on new residents a burden all taxpayers of a municipality should bear equally." § 9-463.05(M).

**¶23** The current statute carries over from its predecessor that "[d]evelopment fees shall result in a beneficial use to the development." § 9-463.05(B)(1). But, adopting terminology from *Dolan*, it adds that the fee "shall not exceed a proportionate share of the cost of necessary public services, based on service units, needed to provide necessary public services to the development." § 9-463.05(B)(3). It further states that "[c]osts for necessary public services . . . shall be based on the same level of service provided to existing development in the service area." § 9-463.05(B)(4). The statute does not define "level of service."

**¶24** The statute lists examples where development fees may not be used. These include the "[c]onstruction, acquisition or expansion of public facilities" if they are not necessary public services or facility expansions identified in the IIP, § 9-463.05(B)(5)(a), and "[u]pgrading, updating, expanding, correcting or replacing existing necessary public services to serve existing development in order to meet stricter safety, efficiency, environmental or regulatory standards," § 9-463.05(B)(5)(c), or "to provide a higher level of service to existing development," § 9-463.05(B)(5)(d). "Necessary public service" is defined to include municipal water and wastewater treatment facilities. § 9-463.05(T)(7)(a)–(b).

**¶25** In assessing development fees, municipalities must use "qualified professionals" to calculate the fees in an IIP based on "projected demand for necessary public services or facility expansions required by new service units for a period not to exceed ten years." § 9-463.05(D)(2), (E)(6).

¶26        Finally, the statute instructs that "[i]n any judicial action interpreting this section, all powers conferred on municipal governments in this section shall be narrowly construed to ensure that development fees are not used to impose on new residents a burden all taxpayers of a municipality should bear equally."  § 9-463.05(M).

B.        Applying A.R.S. § 9-463.05.

¶27        We first articulate our decisional framework.  The trial court and court of appeals applied the deferential treatment toward municipal authority to impose development fees from *City of Scottsdale*, which predated the significant statutory changes that were made after that decision.  Those changes were tantamount to a repeal-and-replacement of the prior statute rather than minor revisions.  *Supra* ¶ 21.  As non-charter municipalities have no inherent powers and derive their authority solely from statute, 1 McQuillan Mun. Corp. § 2:10 (3d ed.); *see State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 607 ¶ 81 (2017) (Bolick, J., concurring), development fees are valid only if the municipality complies with the express statutory requirements of § 9-463.05 in implementing such fees.

¶28        By its own terms, *City of Scottsdale* is largely inapplicable here.  The Court there explained that the legislative acts at issue that were "cloaked with a presumption of validity" were the city's decision that it needed more water and its choice of methods to accomplish that goal.  187 Ariz. at 482.  That presumption of validity does not apply here at all, given that the Town's policy decisions regarding the need for new and improved facilities are unchallenged.

¶29        As to the amount of the development fees, which the Court concluded were not at issue, *City of Scottsdale* also applied a highly deferential "reasonable relationship" standard and assigned to those challenging the fees the "burden of showing that Scottsdale's fee bore no reasonable relationship to the public burden created by the proposed development."  *Id.* at 485.  That standard was removed from the statute in 2011 and replaced with a proportionality standard.  § 9-463.05(B)(3) ("The development fee shall not exceed a proportionate share of the cost of necessary public services, based on service units, needed to provide necessary public services to the development.").

¶30　　　　In applying § 9-463.05 as amended, the court of appeals committed two principal errors. First, it applied from *City of Scottsdale* a presumption of validity to the Town's assessment of development fees. *S. Ariz. Home Builders Ass'n*, 252 Ariz. at 86 ¶ 10. Second, it credited the Town's intent that the project was "entirely for purposes of new development." *Id.* at 87 ¶ 13; *id.* at 89 ¶ 18 (emphasizing the "larger context" that "the acquisition of the WRF and the various upgrades put in place were undertaken for the existential benefit of new development"). The Town's intent is irrelevant; we determine whether the fees are permissible solely on the basis of the Town's compliance with statutory requirements.

¶31　　　　Statutory interpretation requires us to determine the meaning of the words the legislature chose to use. We do so neither narrowly nor liberally, but rather according to the plain meaning of the words in their broader statutory context, unless the legislature directs us to do otherwise. *Matthews v. Indus. Comm'n*, 520 P.3d 168, 175 ¶ 35 (Ariz. 2022). Here, the legislature did just that, expressly directing that "all powers conferred on municipal governments in this section shall be narrowly construed to ensure that development fees are not used to impose on new residents a burden all taxpayers of a municipality should bear equally." § 9-463.05(M). Thus, instead of the deference exhibited by the courts below and in *City of Scottsdale*, 187 Ariz. at 484 ("We would be reluctant to deprive the city of the flexibility needed to deal with these projects unless the legislature made it clear that it intended no such flexibility."), the legislative rewrite of § 9-463.05 greatly constrained municipal authority to assess development fees. To be clear, our role is not to second-guess the Town's policy judgments regarding what facilities are needed to assure a safe and secure 100-year water supply, but to narrowly construe the Town's authority to assess development fees, as § 9-463.05(M) instructs, so as to ensure that new residents do not bear a disproportionate share of the costs of necessary public services.

¶32　　　　As a threshold matter, most if not all of the acquired, new, improved, and expanded facilities clearly provide necessary public services. The statute defines "necessary public services" as including both water and wastewater facilities and the functions performed by those facilities. § 9-463.05(T)(7)(a)–(b). We also readily conclude that the facilities confer a beneficial use on new development, § 9-463.05(B)(1), given that

"[w]ithout the assurance of a water supply, developers would be unable to develop and market their land." *City of Scottsdale*, 187 Ariz. at 482 (construing an unchanged provision of the prior statute). But this only begins the statutory inquiry.

¶33 The court of appeals, trial court, and the Town all acknowledge that the acquisition and improvement of the Town's water facilities benefit both new and existing development. The court of appeals concluded, however, that although "the upgrades and modernization to the WRF incidentally improve[d] the processes serving existing residents," they "[did] not make the development fees unlawful when such upgrades were only undertaken so that the WRF would have the capacity to provide necessary public services to new development." *S. Ariz. Home Builders Ass'n*, 252 Ariz. at 88 ¶ 16. To the contrary, the statute requires proportional allocation of costs between existing and future residents for necessary public services that serve both, regardless of the municipality's motivation. § 9-463.05(B)(3)–(4), (B)(5)(a)–(b), (M). Nor is any exception made to the proportionality requirement for "incidental" benefits.

¶34 The acquisition of the WRF to obtain the effluent and recharge credits to assure a renewable and reliable water supply, the ability to create a closed-loop water system thereby eliminating the need to purchase CAP water and lowering costs, and the improvement in water quality all benefit existing as well as future users. Thus, the costs should be allocated proportionately.

¶35 Section 9-463.05(B)(5)(d) excludes from development fees the cost of "[u]pgrading, updating, expanding, correcting or replacing existing necessary public services to provide a higher level of service to existing development." The term "level of service" is undefined, but by its plain meaning the adjective "higher" suggests not a new or different service but a better service. Higher is defined as "of greater degree, amount, cost, value, or content than average, usual, or expected." *Higher*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/higher (last visited Jan. 11, 2023); Ariz. State House Summary for S.B. 1525, 50th Leg., 1st Reg. Sess. (Mar. 15, 2011) (using development fees for "upgrading . . . existing infrastructure improvements to provide *better service* to existing development" is prohibited (emphasis added)). The Town contends that the level of service for existing residents is the same:

"They get tap water. They flush the toilet and it goes away." But the uncontroverted evidence demonstrates that the improvement in water quality from B+ to A+, which ADEQ mandated as a condition of the project, provides healthier water that may be used for a wider variety of purposes—to the entire community's benefit. Construing the statute narrowly to achieve a fair allocation of costs, as § 9-463.05(M) requires, the Town may not impose the entire cost of the facilities necessary to improve water quality on new residents. To the contrary, § 9-463.05(B)(4) requires that new development costs shall be based on the same level of service provided to existing development. Therefore, the task is identifying the cost to provide B+ quality water to new residents and allocating proportionally the increased costs of improving water quality.

**¶36**		In its answer to the complaint, and through its witnesses, *see* Ariz. R. Civ. P. 30(b)(6), the Town admitted that the remaining Phase 1 projects and improvements—accounting for approximately 90% of the estimated Phase 1 project costs—would benefit both existing and future residents; and despite present disagreement between the parties, the Town is bound by those admissions. *See, e.g.*, Answer to Plaintiff's Complaint ¶ 30 (stating that "upgrading and modernizing the Marana WRF benefited and provided, and continues to benefit and provide, a higher level of service to current and future Town residents"). Examples of those projects and improvements include replacement of the Biolac® system to reduce nitrogen levels; replacement of the secondary treatment system, including secondary clarifiers, to achieve ADEQ compliance and improve water quality; and adding a solids handling facility, which will eliminate reliance on a third-party contractor and reduce costs. Again, such costs should be proportionally distributed.

**¶37**		At no time did the Town and its consultants calculate what should be included or excluded in the development fee, apart from assigning 100% of the costs to new development. As previously noted, the Town contributed roughly $3.2 million, or approximately 15% of the Phase 1 costs. However, that contribution was untethered to any calculation regarding the relative proportion of costs of necessary services attributed to new development and existing users. Rather, the IIPs allocated the full cost of all Phase 1 expenditures to new development, although that was ultimately partly offset by the Town's contribution.

¶**38**　　　In sum, we conclude that the Town violated § 9-463.05 by making future development bear 100% of the cost of acquiring the WRF; by making future development bear nearly all the cost of upgrading, modernizing, and improving the facility; and by failing to determine what could or could not be included in development fees or to make any proportionate allocation of costs between existing and future development. Our conclusion, however, does not absolve new development from paying its proportionate share of costs that may properly be included under the statute. Nor do we second-guess the Town's determination of what facilities or services are needed to serve the needs of its residents. The statutory violation consists of requiring new residents to bear the entire cost of the new, expanded, and improved services and facilities. Under the statute, the proper allocation of costs requires discrete, evidence-based findings of fact and careful adherence to the narrow statutory authority conferred upon municipalities.

¶**39**　　　SAHBA asks us to remand to the trial court with instructions to grant summary judgment in its favor. But because the trial court never made the determinations set forth in the preceding paragraph, we remand for it to do so consistent with the decisional framework set forth in this opinion. SAHBA remains free to argue that certain expenses may not be included in development fees at all. The Town may argue that certain expenses pertain exclusively to new development, and the Town may count its $3.2 million contribution in the calculation. Alternatively, the trial court may determine that the Town should recalculate the development fees in the first instance.

## CONCLUSION

¶**40**　　　For the foregoing reasons, we vacate the court of appeals' opinion, reverse the trial court's judgment, and remand to the trial court for further proceedings consistent with this opinion.