11 P.3d 1032

HOME BUILDERS ASSOCIATION OF CENTRAL ARIZONA, a non-profit corporation; Beazer Homes Holding Corp., a Delaware corporation; Diamond Key Homes, Inc., an Arizona corporation; Providence Homes, Inc., an Arizona corporation; Courtland Homes, Inc., an Arizona corporation, and as class representatives of all others similarly situated, Plaintiffs/Appellants,

v.

CITY OF APACHE JUNCTION, a municipal corporation, Defendant/Appellee,

Apache Junction Unified School District, Intervenor.

No. 2 CA–CV 99–0198.

Court of Appeals of Arizona, Division 2, Department A.

Oct. 12, 2000.

494

Quarles & Brady L.L.P. by Charles W. Herf, Julie A. Pace, and Mireya C. Martin, Phoenix, for Plaintiffs/Appellants.

Law Offices of William E. Farrell by William E. Farrell, Scottsdale, for Defendant/Appellee.

Law Offices of Glenn J. Gimbut by Glenn J. Gimbut, Yuma, for Intervenor.

Miller LaSota & Peters, P.L.C., by Donald M. Peters, and Susan A. Cannata, Phoenix, and John A. Baade, Tucson, for Amici Curiae Arizona School Boards Association, Amphitheater Unified School District No. 10, Cave Creek Unified School District No. 93, Casa Grande Elementary School District, Dysart Unified School District No. 89, Flowing Wells Unified School District No. 8, Gilbert Unified School District No. 41, and Marana Unified School District No. 6.

Law Offices of Neil Vincent Wake, By Neil Vincent Wake and Linda D. Skon, Phoenix, for Amici Curiae Calvis Wyant Homebuilders; Continental Homes; GHE & A, Inc.; Standard Pacific of Arizona, Inc.; Northern Arizona Home Builders; Southern Arizona Home Builders Association; Arizona Chamber of Commerce; Arizona Multihousing Association; Arizona Association of Realtors; and Arizona Tax Research Association.

David R. Merkel, Tempe, for Amicus Curiae, League of Arizona Cities and Towns.

## OPINION

BRAMMER, Presiding Judge.

¶ 1 Appellants, Home Builders Association of Central Arizona and several corporate home builders, appeal from the superior court's judgment concluding that the City of Apache Junction (the City) had statutory authority to pass an ordinance that imposes development fees on residential developments for school capital finance purposes. Concluding that no such authority exists, we reverse and remand.

### Facts and Procedural History

¶ 2 In an apparent attempt to assist the Apache Junction Unified School District (the District), in December 1997, the Mayor and City Council of the City passed Ordinance 1014 (the Ordinance), which amended the City's code, effective March 1998.[1] The Ordinance assesses a fee for "any building permit" issued for single family, multi-family, or mobile or manufactured homes, and cites A.R.S. § 9–463.05 as the authority for its adoption and the imposition of the fee. The amount of the fee varies depending on the type of dwelling unit, with single family homes generating the highest fee and multi-family units the lowest. The purpose of the Ordinance was to raise funds to defray the costs associated with new school construction within the District occasioned by occupancy of new housing facilities within the City.

¶ 3 The day after the Ordinance was adopted, the City and the District entered into an intergovernmental agreement, pursuant to A.R.S. § 11–952. The agreement provides, inter alia, that funds raised by the City pursuant to the Ordinance would be "transferred" to the District for "additional necessary capital school facilities to serve population growth within the ... City as it exists now or as it may be increased in the future."

¶ 4 Appellants filed this action seeking declaratory, injunctive, and special action relief, the latter pursuant to Rules 3(b) and 3(c), Ariz. R.P. Special Actions, 17B A.R.S. Appellants alleged that the City had no authority

---

1. Before it adopted the Ordinance, the City, which the trial court found to be "a general law city," had imposed development fees to help fund municipal facilities and services for police, parks and recreation, libraries, streets, and public buildings.

to enact the Ordinance under § 9–463.05, that article XI, §§ 1 and 2, of the Arizona Constitution essentially precluded the fee, that the fee was an "unauthorized tax," and that its imposition violated their due process and equal protection rights, thereby violating 42 U.S.C. § 1983. Appellants sought a judgment declaring that the Ordinance was "unlawful, arbitrary and capricious and in excess of the legal authority of the [City] under Arizona law," and requested special action and injunctive relief to prevent the City from assessing the fee. Appellants further requested an accounting of the fees already paid as well as their return and prejudgment interest thereon. The trial court granted the District's motion to intervene in support of the Ordinance's validity.

¶ 5 Appellants also sought certification to maintain the action as a class action, pursuant to Rule 23, Ariz.R.Civ.P., 16 A.R.S., requesting relief on behalf of "all entities" who had been charged and who had paid fees to the City pursuant to the Ordinance. They sought a return of the fees, also alleging that, by collecting the fees, the City had deprived the class members of due process of law.

¶ 6 Rather than litigating appellants' request for class certification, civil rights claims, damages, and other issues, the parties stipulated that the trial court should first decide the threshold question of whether the Ordinance was authorized under Arizona law. Although the issue raised a question of law, the trial court held an evidentiary hearing that addressed the social and economic background against which the fee was imposed.[2] After that hearing, the trial court concluded that enactment of the Ordinance was a proper exercise of the City's power under A.R.S. §§ 9–463.05, 9–240(B)(18), 9–240(B)(21)(a), 9–276(A)(16), 9–276(A)(23), and 9–499.01.[3] Accordingly, it denied appellants' request for declaratory, injunctive, and special action re-

lief and entered judgment in favor of the City and the District pursuant to Rule 54(b), Ariz.R.Civ.P., 16 A.R.S. Appellants appeal from that judgment.[4]

## Standard of Review

¶ 7 The central question we must resolve is whether the Ordinance is authorized under either § 9–463.05 or any of the other statutes on which the trial court relied. This presents an issue of statutory interpretation, a question of law that we review de novo. *Tallent v. National Gen. Ins. Co.*, 185 Ariz. 266, 915 P.2d 665 (1996); *Lavidas v. Smith*, 195 Ariz. 250, 987 P.2d 212 (App. 1999). The adoption of the Ordinance is a legislative act that carries a presumption of validity. *See Home Builders Ass'n of Central Arizona v. City of Scottsdale (City of Scottsdale II)*, 187 Ariz. 479, 930 P.2d 993 (1997).

¶ 8 The City and the District argue that we must accord the City's decision to impose the development fee "considerable deference" or must uphold the Ordinance unless it was enacted "arbitrar[ily] and without factual justification." *City of Scottsdale II*, 187 Ariz. at 482–83, 930 P.2d at 996–97; *see also Home Builders Ass'n of Central Arizona v. City of Scottsdale (City of Scottsdale I)*, 179 Ariz. 5, 875 P.2d 1310 (App.1993) (court should defer to municipality's findings that development fee will result in beneficial use and is reasonably related to burden imposed on municipality by development unless those findings are arbitrary, erroneous, and wholly unwarranted). Our resolution of the legal issue here, however, does not hinge on evaluating or questioning the "factual underpinning" or "wisdom" of the City's legislative decision embodied in the Ordinance. *Id.* at 482, 875 P.2d 1310, 930 P.2d at 996. Rather, our focus is on whether any legal authority

---

**2.** By holding the hearing, the trial court apparently agreed with the City's assertion in the stipulation "that discovery relative to social and economic issues, as well as the rationale for the Ordinance must be presented to the Court before a determination can be made on the legal issue of authority."

**3.** Although the trial court's ruling referred to A.R.S. §§ "9–240A.18" and "9–240.A.21.a," it is

clear, as the parties implicitly agree, that the trial court was referring to §§ 9–240(B)(18) and 9–240(B)(21)(a), as subsection (A) of § 9–240 consists of one sentence with no further subparts.

**4.** Several amici have appeared, both here and in the trial court, supporting the respective positions advanced by the appellants, the City, and the District.

exists for the City to take the action it did. *See City of Scottsdale I,* 179 Ariz. at 7, 875 P.2d at 1312 (although courts generally defer to municipalities' legislative determinations of factual matters, municipalities nonetheless "may not use fees for any purpose or in any manner that will not meet the statutory requirements").

## Legal Framework

¶ 9 We set forth below selected parts of the Ordinance to which the parties primarily direct their arguments:

WHEREAS, A.R.S. § 9–463.05 authorizes cities and towns to assess development fees to offset costs to the municipality associated with providing necessary public services to a development; and,

. . . .

WHEREAS, the Mayor and City Council of the City of Apache Junction have found that a development fee for additional necessary school capital facilities is not only necessary but will result in beneficial use to new development; and,

WHEREAS, the Mayor and City Council of the City of Apache Junction have determined that new development within the City impacts the Apache Junction School District by requiring additional necessary school capital facilities, new school buildings with required educational and recreational facilities and equipment;

NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF APACHE JUNCTION, ARIZONA, AS FOLLOWS:

*Section I IN GENERAL*

That the Apache Junction City Code Volume 2, Land Development Code, Chapter 7, is hereby amended by adding a new Article 7–2 *Development Fees for Schools* to read as follows:

## Section 7–2–1 Authorization

This Section is authorized by Ordinance No. 1014 and is enacted pursuant to the general police power of the City and the authority granted to the City by the State of Arizona as found in A.R.S. § 9–463.05.

## Section 7–2–2 Purpose and Intent

It is the purpose and intent of the City of Apache Junction to implement a comprehensive plan by requiring that new development pay for its share of public facilities through the imposition of development fees that will be used to finance, defray, or reimburse all or a portion of the costs incurred by the municipality to provide additional necessary public services to its citizens resulting from new residential development within the City.

. . . .

## Section 7–2–4 Applicability

Unless expressly excepted or exempted, this Article applies to all fees imposed by the City to finance, defray or reimburse the cost of additional necessary school capital facilities including additional school buildings, educational or recreational facilities and necessary equipment required by the Apache Junction Unified School District.

. . . .

## Section 7–2–6 Definitions

When used in this Article, the following words, terms and phrases, and their derivations, shall have the meaning ascribed to them in this Section, except where the context clearly indicates a different meaning:

A. **Benefits Area** means that geographic area within the City limits of the City of Apache Junction as they exist now or as they may be amended by annexation wherein the fees are collected and expended for a particular capital improvement serving the development within the benefited area.

B. **Capital Improvement** means land or facilities owned, operated or used by the Apache Junction Unified School District for educational and recreational purposes as well as the equipment and furniture necessary to own, operate or use the facility. Capital improvement also includes costs associated with design, engineering, land acquisition and all other costs normally associated with construction of a capital improvement.

. . . .

D. **Capital Improvement Project List** means a list submitted annually to the City by the School District describing the location, size, time of availability and estimated cost of each capital improvement authorized by the District and to be considered by the City for funding from this particular development fee account.

E. **New Development or Development Project** means any project undertaken for the purpose of development, including without limitation, a project involving the issuance of a permit for construction, reconstruction or addition to any land located within any zoning district designated as a residential district.

### Section 7–2–7  Development Fee

**FROM AND AFTER** the effective date of this Article, the following fees shall be charged and collected at the time and issuance of any building permit as follows:

All single-family, detached residential dwelling units, including site-built, manufactured, and modular—$1,368.00; all permits for the placement and location of mobile and manufactured homes in a designated park—$366.00; each individual dwelling unit in any multi-family dwelling unit project—$276.00 per dwelling unit.

. . . .

### Section 7–2–9  Use of Development Fees

The City Council may authorize the transfer of funds to the Apache Junction Unified School District in an amount certain which is designated by resolution for usage of the District in connection with any project on the capital improvements project list previously submitted to the City. The City Council shall schedule a public hearing and take public comment and testimony regarding the proposed use of the funds prior to the actual authorization of transfer. The City Council may also, in its sole discretion, authorize the use of the fund by the direct payment of invoices submitted to the School District by third parties if said invoices have been approved for payment in advance by the School District and are entirely associated with a capital improvement project that has been approved by both the School District and the City.

Section 9–463.05, the statute on which the City and the District primarily rely, provides in pertinent part as follows:

§ 9–463.05.  Development fees; imposition by cities and towns

A.  A municipality may assess development fees to offset costs to the municipality associated with providing necessary public services to a development.

B.  Development fees assessed by a municipality under this section are subject to the following requirements:

1.  Development fees shall result in a beneficial use to the development.

2.  Monies received from development fees assessed pursuant to this section . . . may only be used for the purposes authorized by this section. . . .

3. . . . The developer of residential dwelling units shall be required to pay development fees when construction permits for the dwelling units are issued.

4.  The amount of any development fees assessed pursuant to this section must bear a reasonable relationship to the burden imposed upon the municipality to provide additional necessary public services to the development. . . .

### Discussion

■ ¶ 10  General law cities such as Apache Junction may exercise only those powers expressly granted them by the legislature, together with those powers that arise by necessary implication out of those that are expressly granted. *City of Glendale v. White*, 67 Ariz. 231, 194 P.2d 435 (1948); *see also Uhlmann v. Wren*, 97 Ariz. 366, 393, 401 P.2d 113, 131 (1965) (Bernstein, J., specially concurring) ("Where a municipal corporation is involved, specific legislative authority must be found for all of its activities."); *Shaffer v. Allt*, 25 Ariz.App. 565, 570, 545 P.2d 76, 81 (1976) ("[M]unicipalities, be they charter or otherwise, have no implied powers, except such as may be fairly implied from expressed powers."); *cf. City of Mesa v. Smith Co. of Arizona*, 169 Ariz. 42, 816 P.2d 939 (App. 1991) (municipality can only exercise right of

eminent domain when it is conferred by legislature expressly or by necessary implication).

¶ 11 The City and the District argue that § 9–463.05 and various other statutes expressly authorize the City to impose the fee. They also contend that the fee is implicitly permitted because neither the constitution nor any statute expressly prohibits the City from imposing it. We have been cited no relevant authority to support the proposition that such authority may be inferred; rather, there is substantial authority requiring that a city must have authority to support its actions. *Uhlmann; City of Glendale; Shaffer.*

¶ 12 The powers of cities are set forth in A.R.S. §§ 9–274 and 9–276. Additionally, under § 9–499.01, cities may exercise any powers possessed by towns. *See, e.g.,* A.R.S. §§ 9–240 through 9–244. None of those provisions, even by implication, gives cities or towns any authority over or responsibility for public school matters. Rather, as discussed below, responsibility for public schools lies elsewhere. *See, e.g.,* Ariz. Const. art. XI, §§ 1 and 2; A.R.S. §§ 15–341 and 15–342.

¶ 13 As our supreme court has observed, "The Arizona education statutes reflect the complexity of the underlying system . . . [and the] financing scheme is particularly complex." *Roosevelt Elementary Sch. Dist. Number 66 v. Bishop,* 179 Ariz. 233, 236, 877 P.2d 806, 809 (1994). Referring specifically to the funding of Arizona's public education system, the court stated, "Under the formula [provided by the statutory scheme], the cost of public education is allocated as follows: the state (45%), local districts (45%), and the United States and counties collectively (10%)." *Id.* at 237, 877 P.2d at 810. The court did not suggest, nor have we found any authority stating or suggesting, that any other governmental unit, or private citizen or entity, has additional affirmative financial responsibility for Arizona's public educational system. *See id.* at 240, 877 P.2d at 813 ("The only sources [of funding] mentioned [in article XI, of the Arizona Constitution] are the state and the counties.").

¶ 14 Indeed, article XI, § 1, of the Arizona Constitution provides that the "[l]egislature shall . . . provide for the establishment and maintenance of a general and uniform public school system, which system shall include kindergarten schools, common schools, [and] high schools." Section 2 of the same article provides that the "general conduct and supervision of the public school system shall be vested in [the] State Board of Education, a State Superintendent of Public Instruction," and others, but does not mention a role for cities or towns. Although local school districts also have a role in financing their own needs, we find nothing in the law imposing any duty or responsibility upon municipalities to act in this area. *See generally* § 15–341 (listing mandatory duties of school district governing boards) and § 15–342 (discretionary powers); *see also Hull v. Albrecht,* 192 Ariz. 34, ¶ 9, 960 P.2d 634, ¶ 9 (1998) (once legislature has met its responsibility for minimally adequate school system, school district may "seek local sources of revenue, such as property taxation, to surpass the state standards"). *See, e.g.,* A.R.S. § 15–481(Y) (school district shall hold public meeting when increasing its budget pursuant to subsections (L) or (M), at which meeting the school district shall discuss the use of voter-approved bonding in funding possible capital improvements) and § 15–491(A) (providing rules for elections regarding use of bonds to fund improvements).

¶ 15 Appellants argue, and the City and the District essentially concede, based on our constitution and on supreme court authority, that the legal responsibility for financing Arizona's public schools rests with the legislature and school districts, not with municipalities. The City and the District contend, however, that although municipalities may have no affirmative duty to finance public schools, they may do so voluntarily. They rely primarily on § 9–463.05 as authority for permitting the imposition of municipal development fees to raise funds for school capital finance purposes. Accordingly, we first address that statute.

A. Section 9–463.05 as a Basis for the Ordinance

¶ 16 As noted above, § 9–463.05(A) permits a municipality to "assess develop-

ment fees to offset costs to the municipality associated with providing necessary public services to a development." Although that statute clearly grants municipalities power to assess development fees for specific purposes within certain limitations, the question remains whether one of those purposes may be to finance public school capital needs.[5] In *City of Scottsdale II*, our supreme court found the phrase "necessary public services" in § 9–463.05(A) to include water service, upholding a municipality's assessment of a development fee that would assist the municipality in complying with state statutes governing municipal water use. Similarly, sewer service would likely also be considered a necessary public service.[6] *See* A.R.S. §§ 9–276(A)(3) and (21) (authorizing construction and repair of sewers). Whether "necessary public services" under the statute should be construed to allow a municipality to impose such a fee for school capital finance purposes appears to be an issue of first impression in Arizona.

¶ 17 Appellants assert that, because municipalities have no legal obligation to provide public education, any costs associated with doing so cannot be considered "costs to the municipality" of providing a "necessary public service" as contemplated by § 9–463.05(A). In addition, appellants contend that spending municipal funds to provide educational services or buildings is not a necessary public service within the meaning of the statute, and, therefore, a municipality may not lawfully impose a fee to generate the funds to be used for school capital finance purposes.

■ ¶ 18 In contrast, the City and the District argue in favor of a broad construction of "necessary public services" in § 9–463.05(A) by comparing it to the limited authority to impose development fees granted to counties by A.R.S. § 11–1102. Under A.R.S. § 11–1101(5), "development" is defined as any construction, expansion, or change in the use of buildings, structures, or land that "affects a county's need for public facilities." Section 11–1101(14) includes within the definition of "public facilities" a list of specific things, including roadways, wastewater treatment facilities, and flood control works. The City and the District argue that, because the legislature expressly limited the use for development fees imposed by counties and did not specify similar limitations in § 9–463.05 with respect to what constitutes "necessary public services," cities are not so limited. The City and the District urge us to read "necessary public services" broadly to include schools and their funding. That counties are expressly limited in the matters for which they may assess fees does not allow us to expand by inference the City's power nor does it provide us with a basis for construing its power to be broader than that authorized by our constitution or our legislature.

■ ¶ 19 Because nothing in the constitution or statutes giving powers to cities and towns suggests that cities have any authority over or responsibility for public school matters that, by implication, would provide authority to raise revenue to support them, we do not construe "necessary public services" to include the funding of public schools. Further, "costs to the municipality" must be caused by the direct provision of a "necessary public service" such as educational services or facilities, something for which the City has no legal responsibility. It would seem incongruous to conclude, therefore, that "necessary public services" in § 9–463.05(A) includes funding the capital needs of public schools so as to permit municipal imposition of a development fee to do so, particularly in the absence of constitutional or statutory authorization for municipal expenditures or action in this area.

¶ 20 The City argues, and the trial court found, that the City's increasing population also increases the District's student population, thereby causing the City to incur additional, indirect costs associated with exten-

---

**5.** No suggestion has been made, and we do not therefore address, whether funds raised by the Ordinance may be used to fund school district operational or maintenance needs.

**6.** In another context, "essential public facilities" are defined as "water, sewer and street improvements to the extent that these improvements and water resources are provided by, [inter alia,] the city." A.R.S. § 9–463.06(I)(2).

sion of public services such as water, sewer, roads, police, and the like to District schools that the additional students attend. Pursuant to the Ordinance, however, the fee is to be used to build the schools by providing the District with direct financial assistance; it is not to be used to build sewers and roads or to provide water and police services. Because § 9–463.05 only authorizes imposition of fees for services a city provides to a development, such fees cannot be imposed on developments to finance capital construction of school facilities on the ground that, once the schools are built, the City must provide services to such schools. Even if we were to assume as true the City's claim that there would be an increase in the need for and cost of public services, it is not relevant to the purely legal question before us: whether Arizona law has authorized the City to enact the Ordinance and the fee it imposes.

¶ 21 Moreover, although not controlling to our legal analysis, the record does not differentiate between indirect costs for services the City claims will be incidental to newly constructed schools and costs the City regularly incurs to provide these same services to all of its residents. This is so no matter where in the city they reside, how long they have resided there, in what type of dwelling they reside, or whether school-aged children are among the residents. We do not believe the statute contemplates that municipalities will estimate indirect cost amounts for services occasioned by new school construction it provides on account of, but not to, a development, and impose a fee on the development's builder to defray those estimated costs. Rather, we believe the statute con-

templates that only direct costs of the services provided to the developments may be funded with fees it authorizes particularly when, as here, the municipality already assesses fees to developers to support many of the services it provides to the developments. We therefore conclude that § 9–463.05 does not authorize the City to impose a development fee to finance capital school construction.[7]

**B. Other Possible Statutory Bases for the Ordinance**

¶ 22 Although the Ordinance provides that it was enacted pursuant to the City's authority under § 9–463.05, the trial court, at the District's urging, found that the Ordinance was also authorized pursuant to §§ 9–240(B)(18), 9–240(B)(21)(a), 9–276(A)(16), and 9–276(A)(23).[8] Accordingly, we address these other statutes as possible authority for the City's enactment of the Ordinance.[9]

¶ 23 Section 9–240(B)(18) authorizes towns, and hence cities, pursuant to § 9–499.01, to "fix the amount of license taxes to be paid by any person, firm, corporation or association for carrying on any business, game or amusement, calling, profession or occupation." The City and the District correctly note that the legality of a tax imposed pursuant to this section has been upheld as applied to new dwelling units. *See City of Mesa v. Home Builders Ass'n of Central Arizona, Inc.*, 111 Ariz. 29, 523 P.2d 57 (1974). Appellants argue that the City's new development fee, which the City conceded at oral argument was not a tax, cannot be upheld on that basis because the fee is imposed on whomever builds a new residence, regard-

7. Because of our resolution of this issue, we need not determine whether the Ordinance and the development fee imposed thereunder satisfy various requirements of § 9–463.05, such as the requirement that it must result in a "beneficial use to the development." § 9–463.05(B)(1). *See, e.g., City of Scottsdale II* (developer receives special benefits by acquisition of water essential to city's ability to approve new development).

8. The trial court also cited to § 9–499.01, but that section alone provides no substantive authority for the City's passing of the Ordinance. As indicated earlier in this decision, that section provides that cities also have any powers possessed by towns.

9. Citing A.R.S. § 15–342(25)(c), the City and the District also assert that nothing prevents a school district from receiving donated monies, a proposition with which we do not disagree. That provision simply provides that school district governing boards may construct school buildings without a vote of the school district electors when the construction is funded with monies donated for that purpose, and has no bearing on the method the donor uses to raise the funds. We have been provided no authority, nor have we discovered any, suggesting that this statute provides any support for the Ordinance.

less of whether they are in the "business" or pursuing the "occupation" of building residences, or are simply individuals building their own homes.

¶ 24 We agree with appellants. Although the court stated in *Home Builders* that the tax involved in that case was imposed "on every person constructing a dwelling unit or a mobile home or trailer space," *id.* at 30, 523 P.2d at 58, the court did not have to determine whether such a tax could be applied to someone not in the business of building residences because the party objecting to the tax represented those who were. Section 9–240(B)(18) applies only to those "carrying on any business, game or amusement, calling, profession or occupation." The Ordinance, in contrast, is not limited to those constructing a residence as part of their business or profession, but, rather, applies to issuance of any building permit. *See* Apache Junction City Code § 7–2–7. The Ordinance's application extends beyond the scope of § 9–240(B)(18) and, therefore, cannot be based on it. Moreover, the City already imposes a license tax on contractors pursuant to other portions of its code. We conclude that § 9–240(B)(18) provides no authority for the City's enactment of the Ordinance or the development fee it imposes.

¶ 25 Nor does § 9–240(B)(21)(a) or § 9–276(A)(16) provide such authority because those provisions only give towns and cities, respectively, the power to define and abate nuisances. The record does not reflect that the structures to which the Ordinance applies constitute nuisances, that is, something that unreasonably interferes with another's enjoyment of his or her property and causes damage thereto, *see Graber v. City of Peoria*, 156 Ariz. 553, 753 P.2d 1209 (App. 1988), or that the trial court so concluded. The court erred in concluding that these two statutes authorized the City to pass the Ordinance.

¶ 26 Section 9–276(A)(23) authorizes cities to make "local improvements by special assessments, by special taxation or

otherwise, as they shall by ordinance prescribe." A local improvement within the meaning of the statute is one that benefits primarily the adjacent or nearby assessed property, as opposed to the public at large, and thereby "peculiarly benefits" the assessed property. *Home Builders Ass'n of Central Arizona, Inc. v. Riddel*, 109 Ariz. 404, 407, 510 P.2d 376, 379 (1973); *see also City of Scottsdale II* (in contrast to development or impact fees, a special assessment requires concrete plans that will result in immediate benefit to landowner on which assessment is levied). Nothing in the record suggests that the properties owned by those assessed a development fee pursuant to the Ordinance would receive peculiar benefits that all other property in the City would not. Accordingly, we find no support for the City's enactment of the Ordinance in § 9–276(A)(23).

¶ 27 Although not relied on by the trial court, the City and the District contended almost in passing in their brief, but asserted more vigorously at oral argument, that A.R.S. § 15–364(B) supports the City's enactment of the Ordinance. That statute is a part of the education code and states, in pertinent part, that "cities ... may expend public monies and enter into agreements with ... school district governing boards for the construction, development, cooperative maintenance, operation and use of parks, swimming pools and other recreational facilities on properties used for school purposes." Although this language unquestionably permits the City to spend its funds cooperatively with the District for such purposes, the statute mentions only that "public monies" may be used for such purposes, and does not specify the source of those funds.[10] This statute does not authorize the fee imposed by the Ordinance to construct public educational facilities.

¶ 28 The City and the District also point to A.R.S. § 48–701(12)(k), which pertains to a community facilities district's authority to construct public school facilities. Although a community facilities district may

---

10. Cities with a population of five hundred thousand or more may use bond funds for these purposes. A.R.S. § 15–364(C).

be formed by a municipality, § 48–701(4), nothing in this record suggests that the City has formed such a district for the purpose of assisting the District in constructing public school facilities. Further, neither the City nor the District have cited, nor have we found, any authority suggesting that such districts may levy fees pursuant to § 9–463.05. Accordingly, we find no support here, either direct or tangential, for the Ordinance or the fee it imposes.

## C. Authority from Other Jurisdictions

¶ 29 Although the City and the District rely on several cases from other jurisdictions, we find those cases to be both distinguishable and unhelpful. In the cases that upheld the municipal imposition of a school impact fee, or a fee in lieu of dedication of land for school purposes, the respective state statutes expressly authorized municipalities to financially support public schools. *See Fontana Unified Sch. Dist. v. City of Rialto,* 173 Cal. App.3d 725, 219 Cal.Rptr. 254 (1985) (state statute authorized city to require dedication of land or payment of fees or both for school facilities as condition of residential development approval); *St. Johns County v. Northeast Florida Builders Ass'n, Inc.,* 583 So.2d 635 (Fla.1991) (impact fee on new residential construction upheld; state statutes expressly authorized counties to expend funds for school purposes); *Jordan v. Village of Menomonee Falls,* 28 Wis.2d 608, 137 N.W.2d 442 (1965) (fee in lieu of dedication of land upheld as condition of subdivision approval, when state statute authorized municipal subdivision regulations to facilitate provision for, inter alia, schools and parks).

¶ 30 Appellants have also cited cases from other jurisdictions, but each construed statutes dissimilar to § 9–463.05. *See County Comm'rs of Douglas County, Colorado v. Bainbridge,* Inc., 929 P.2d 691 (Colo.1996); *West Park Ave., Inc. v. Township of Ocean,* 48 N.J. 122, 224 A.2d 1 (1966). Additionally, unlike here, based on the applicable statutes, the courts in those cases were not required to consider whether the assessments would be used to defray "costs to the municipality" or whether they would be used for "necessary public services." Accordingly, we rest our analysis on the plain language of the Arizona statutory scheme and the Arizona authority we have cited.

## Attorney's Fees

¶ 31 Appellants have requested attorney's fees on appeal, citing A.R.S. § 12–2030 and *Winter v. Coor,* 144 Ariz. 56, 695 P.2d 1094 (1985). Section 12–2030 applies to actions in mandamus, which are actions that seek to compel a state officer or any officer of a political subdivision to perform some mandatory duty. Writs of mandamus have been largely replaced by and are now typically brought as special action proceedings. *See* Ariz. R.P. Special Actions 1(a); *Circle K Convenience Stores v. City of Phoenix,* 178 Ariz. 102, 870 P.2d 1198 (App.1993). In this case, however, appellants did not seek what has historically been classified as mandamus relief. Although the complaint stated that the action was brought under Rules 3(b) and 3(c), Ariz. R.P. Special Actions, the traditional mandamus theory of relief is contained in Rule 3(a), which allows one to challenge the defendant's alleged failure "to perform a duty required by law as to which he has no discretion." Because appellants did not seek mandamus-type relief, they cannot rely on § 12–2030 for an award of attorney's fees. *See Circle K* (denying fees under § 12–2030 when mandamus relief not sought). Nor does *Winter* provide a basis for an award of fees, as it involved an award based on A.R.S. § 12–341.01 for actions arising out of contract. Appellants' request for attorney's fees on appeal is accordingly denied.

## Conclusion

¶ 32 Because we conclude none of the authority cited by the trial court supports the City's ability to adopt the Ordinance imposing a development fee for school capital finance purposes, we reverse its ruling. Because that ruling, pursuant to the parties' stipulation, did not address the other issues the complaint raised, we remand this case to the trial court for further proceedings consistent with this decision.

CONCURRING: M. JAN FLÓREZ, Judge, and JOHN PELANDER, Judge.