243 P.3d 610

**HOME BUILDERS ASSOCIATION OF CENTRAL ARIZONA,**
**Plaintiff/Appellant,**

v.

**CITY OF MESA, Defendant/Appellee.**

**No. 1 CA–CV 09–0583.**

Court of Appeals of Arizona,
Division 1, Department C.

Nov. 4, 2010.

---

Scharf–Norton Center for Constitutional Litigation, By Clint Bolick, and Gustavo E. Schneider, and Carrie Ann Sitren, Phoenix, Attorneys for Appellant.

Mariscal Weeks McIntyre & Friedlander, P.A., By Gary L. Birnbaum, and David J.

Ouimette, and Andrew L. Pringle, Phoenix, Attorneys for Appellee.

## OPINION

SWANN, Judge.

¶ 1 Home Builders Association of Central Arizona ("HBA") appeals the superior court's decision that the City of Mesa's cultural facilities development fee is lawful under A.R.S. § 9–463.05. HBA asks us to determine whether Mesa's cultural facilities are "necessary" public services within the meaning of A.R.S. § 9–463.05(A), and we conclude that they are. We hold that Mesa may impose the cultural facilities development fee under the statute because the maintenance of the facilities is rationally related to the powers that the Legislature has granted to municipalities, and because such facilities traditionally have been provided by Mesa to its residents.[1] For the reasons discussed below, we also affirm the trial court's grant of summary judgment in favor of Mesa with respect to the "beneficial use" and "reasonable relationship" requirements of the statute.

### FACTS AND PROCEDURAL HISTORY

¶ 2 HBA filed a complaint against Mesa seeking a declaration that the cultural facilities portion of Mesa's development impact fee ordinance violates A.R.S. § 9–463.05 because cultural facilities are not "necessary" public services, the fee does not result in beneficial use to most new development, and the fee is not reasonably related to the burden imposed by new development. The parties filed cross motions for summary judgment.

¶ 3 The facts are not in dispute. Mesa amended its impact fee ordinance in 2007 after retaining an outside consultant to study the costs associated with new development. The ordinance includes a legislative finding that each public service receiving a portion of the impact fee, including cultural facilities, is necessary.[2] Mesa City Code § 5–17–1(C).

¶ 4 The city does not have specific plans to construct or expand cultural facilities. Rather, Mesa determined the amount of the cultural facilities impact fee by calculating the current cost of existing cultural facilities and dividing the cost by the number of "equivalent dwelling units" in the city. The ordinance sets fees slightly below the level recommended by the study.

¶ 5 The superior court entered summary judgment in favor of Mesa. HBA filed a timely notice of appeal. This court has jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. § 12–2101(B).

### DISCUSSION

I. CULTURAL FACILITIES ARE "NECESSARY PUBLIC SERVICES" AS PROVIDED IN A.R.S. § 9–463.05.

¶ 6 "Development or impact fees are presumed valid as exercises by legislative bodies of the power to regulate land use." *Home Builders Ass'n of Cent. Ariz. v. City of Scottsdale (Scottsdale III)*, 187 Ariz. 479, 482, 930 P.2d 993, 996 (1997). Accordingly, the legislative decision must stand unless it is demonstrated to be without factual support. *Id.* We do not interfere with a legislative body's determination of the means by which it elects to provide necessary public services. *Id.* But whether cultural facilities are a "necessary" public service that can be the lawful subject of a development fee is a question of law and a matter of statutory interpretation, which we review de novo. *See Home Builders Ass'n of Cent. Ariz. v. City of Apache Junction*, 198 Ariz. 493, 496–97, ¶¶ 7–8, 11 P.3d 1032, 1035–36 (App.2000) (declining to accord "considerable deference" when determining whether the city had statutory authority to enact a development fee).

¶ 7 Because the term "necessary public services" is not defined in A.R.S. § 9–463.05 or elsewhere in Title 9, we must deter-

---

1. As we discuss below, "necessary" services are not limited to those services that the City has traditionally provided. A municipality may also establish new "necessary" services when it complies with relevant planning statutes.

2. The only substantive statement of facts was submitted by HBA in support of its summary judgment motion. Mesa filed only a copy of its ordinance setting impact fees.

mine its meaning. *Scottsdale III*, 187 Ariz. at 483, 930 P.2d at 997. To do so, we look to the language of the statute to determine legislative intent. *Yarbrough v. Montoya–Paez*, 214 Ariz. 1, 5, ¶ 12, 147 P.3d 755, 759 (App.2006). And we construe statutory provisions in a manner consistent with related provisions. *Goulder v. Ariz. Dep't of Transp., Motor Vehicle Div.*, 177 Ariz. 414, 416, 868 P.2d 997, 999 (App.1993).

¶ 8 Generally, ordinances that impose development fees are enacted pursuant to a municipality's police powers—to promote the safety, health and general welfare of its residents. 8 Eugene McQuillin, *The Law of Municipal Corporations* § 25:136, at 591 (3d ed.2010). "And as to a city's power to enact regulations necessary to promote the general welfare of its people, the concept of what is in the interest of the public welfare is given a broad range." Id. In Arizona, city councils have broad authority to enact, amend or repeal laws that are "necessary or proper" to implement those powers that are granted to them. A.R.S. § 9–240(B)(28)(a). By enacting A.R.S. § 9–463.05(A), the Arizona Legislature specifically granted municipalities the power to impose development fees. That section provides:

A municipality may assess development fees to offset costs to the municipality associated with providing *necessary public services* to a development, including the costs of infrastructure, improvements, real property, engineering and architectural services, financing, other capital costs and associated appurtenances, equipment, vehicles, furnishings and other personalty.

(Emphasis added.)

¶ 9 Notably absent from A.R.S. § 9–463.05 is a definition or enumeration of those public services that the Legislature considered "necessary." In the absence of specific direction from the Legislature, we construe the term "necessary public services" broadly. *See, e.g., Home Builders Ass'n of Cent. Ariz. v. City of Scottsdale (Scottsdale I)*, 179 Ariz. 5, 10, 875 P.2d 1310, 1315 (App.1993) (applying the "less restrictive standards approach" to A.R.S. § 9–463.05); *Nw. Fire Dist. v. U.S.*

*Home of Ariz. Const. Co.*, 215 Ariz. 492, 496–97, ¶ 25, 161 P.3d 535, 539–40 (2007) ("[T]he ability to impose a development fee is broader than the ability to impose a special assessment."). But we are mindful of the constitutional and statutory restraints that determine the limits of a city's power. *See Apache Junction*, 198 Ariz. at 500, ¶ 18, 11 P.3d at 1039 ("That counties are expressly limited in the matters for which they may assess fees does not allow us to expand by inference the City's power nor does it provide us with a basis for construing its power to be broader than that authorized by our constitution or our legislature.").

¶ 10 To define the term "necessary," HBA urges us to look to the common usage of the word, along with the stated legislative purposes of the statute.[3] Mesa, however, contends that we must defer to the city council's own determination that the fee is necessary, unless it is arbitrary or capricious. We are not convinced that either approach is correct. HBA's approach implies that a judge's subjective view of what is "necessary" should trump the legislative judgment of a city council charged with maintaining and advancing the character of the community it serves. We see nothing to suggest that the Legislature intended such a scheme. Mesa's approach, on the other hand, would effectively eliminate the courts' role in interpreting the statute except in the most extreme cases. Our reading of the statute suggests a different formula: one sufficiently flexible to preserve the broad powers of municipal governments to respond to the needs of the diverse communities they serve, while preserving the ability of the courts to enforce the statute according to its intended meaning.

¶ 11 Because the resolution of this case hinges on the proper definition of the term "necessary," we turn for guidance to the United States Supreme Court's recent discussion of that term in *United States v. Comstock,* —— U.S. ——, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010). There, the Supreme Court considered whether the Necessary and

---

**3.** The statement of legislative intent neither mentions nor implies any legislative view on the meaning of the word "necessary." 1982 Ariz. Sess. Laws, ch. 187, § 1.

Proper Clause, U.S. Const. art. I, § 8, cl. 18, granted Congress the authority to enact a law that would permit the civil commitment of mentally ill, sexually dangerous prisoners beyond their scheduled release dates. 130 S.Ct. at 1954. The Court focused on a question analogous to that presented here: whether the law must be *absolutely* necessary before Congress is authorized to act pursuant to the Necessary and Proper Clause. The Court restated the long-standing rule that "the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'"[4] *Id.* at 1956 (quoting *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 413, 418, 421, 4 L.Ed. 579 (1819)). The Court noted that in *M'Culloch,* "Chief Justice Marshall emphasized that the word 'necessary' does not mean 'absolutely necessary.'" *Id.* (citing *M'Culloch,* 17 U.S. (4 Wheat.) at 413–15; *Jinks v. Richland County,* 538 U.S. 456, 462, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003)). To determine whether it was within Congress's power to enact a particular law pursuant to the Necessary and Proper Clause, the Court instead looked "to see whether the statute constitute[d] a means that [was] rationally related to the implementation of a constitutionally enumerated power." *Id.* at 1956–57 (citations omitted).

¶ 12 The *Comstock* test, limited by the other terms of A.R.S. § 9–463.05, provides an appropriate balance that allows municipalities to determine the character of their cities and to ensure a uniform application of the statute. Under that test, "necessary" is an elastic term that can be applied on a case-by-case basis to the needs of individual communities. Accordingly, whether cultural facilities are "necessary" public services depends on whether they are rationally related to the implementation of powers specifically granted to the municipality. *See generally* A.R.S. § 9–240(B). But our analysis does not end there.

¶ 13 Under A.R.S. § 9–463.05(B)(4), "[t]he amount of any development fees assessed pursuant to this section must bear a reasonable relationship to the burden imposed upon the municipality to provide *additional necessary public services* to the development." (Emphasis added.) The requirement of a nexus between the amount of the fee and the burden imposed indicates the legislative intent to limit the imposition of the fee to actual services provided, or to be provided, by the municipality. *See also* A.R.S. § 9–463.05(E)(1) (requiring infrastructure improvement plans to include an "[e]stimate [of] future necessary public services that will be required as a result of new development"). We therefore conclude that "necessary" public services are limited to existing services that are already provided by the municipality, or those identified in a properly promulgated general plan or infrastructure improvement plan. Nothing in Arizona's statutory scheme suggests an unfettered delegation of authority to impose development fees for projects or services that have not met the tests of history or lawful planning.

¶ 14 We therefore hold that before a municipality is authorized to impose a development fee pursuant to A.R.S. § 9–463.05, the public service must be rationally related to the powers granted to a municipality, and the service must be one that traditionally has been provided or lawfully forecast pursuant to statutes governing municipal planning. We next apply that test to the fees at issue here.

## II. THE IMPACT FEES BEAR A RATIONAL RELATIONSHIP TO MESA'S MUNICIPAL POWERS.

¶ 15 In *Apache Junction,* we rejected a city's imposition of a development fee for educational purposes because public school finance lay outside the city's power. 198 Ariz. at 500, ¶ 19, 11 P.3d at 1039. Here, however, our Legislature has express-

---

4. We recognize, of course, that this case does not arise under the federal constitution. Absent guidance from our Legislature, however, we turn to this long-standing authoritative definition of the term "necessary" to ensure that we construe it in a manner consistent with its common usage in analogous contexts.

ly granted to municipalities the power to develop, adopt and finance plans for infrastructure expansion and improvements related to tourism.[5] When, as here, a city has a population of over 10,000 people, it is required to develop and adopt a general plan that identifies areas suitable for infrastructure expansion and improvements that are designed to support a variety of uses, including tourism. A.R.S. § 9–461.05(D)(2). This plan must include policies and strategies that promote financially sound infrastructure expansion "through the use of infrastructure funding and financ[ial] planning that is coordinated with development activity." A.R.S. § 9–461.05(D)(2)(c). As part of the plan, municipalities are required to include a "cost of development element," identifying the strategies and policies they "will use to require development to pay its fair share toward the cost of additional public service needs generated by new development." A.R.S. § 9–461.05(D)(4). These provisions grant municipalities authority to develop and fund tourism-related improvements, which include cultural facilities. Mesa's imposition of a development fee for the purpose of funding cultural facilities was, therefore, rationally related to the powers it was granted.

### III. MESA HAS TRADITIONALLY PROVIDED CULTURAL SERVICES.

▇ ¶ 16 Mesa has imposed a development fee for cultural facilities since 1998. The purpose of the fee was "to ensure that new residential development pays its fair share of the capital cost to maintain the current level of service of cultural facilities," which include a historical museum, an art museum and a youth museum. In 1998, the fee imposed was $59 per single-family unit, with biennial increases that reached their apex in 2006 at $237 per unit. But after the 2007 study on Mesa's impact fees, cultural facilities fees were reduced to $217 per residential unit. Though the amount of the fee has changed throughout the years, the city has consistently imposed cultural facilities fees, and provided cultural facilities, for more

than a decade. Accordingly, we hold that cultural facilities are existing necessary public services that Mesa traditionally has provided to its residents. It is therefore not necessary to address other potential sources of validity, such as the inclusion of contemplated services in a general plan.

### IV. MESA'S CULTURAL FACILITIES DEVELOPMENT FEE COMPLIES WITH THE BENEFICIAL USE AND REASONABLE RELATIONSHIP REQUIREMENTS OF A.R.S. § 9–463.05(B)(1) AND (4).

▇ ¶ 17 As a preliminary matter we address HBA's argument that Mesa's lack of specific plans for construction or expansion of cultural facilities precludes Mesa from satisfying the "reasonable relationship" and "beneficial use" requirements of A.R.S. § 9–463.05. To be sure, Mesa is required to provide evidence of *some* planned use for the development fee. But A.R.S. § 9–463.05 does not require specific, concrete plans. *Scottsdale III*, 187 Ariz. at 483, 930 P.2d at 997.

¶ 18 In *Scottsdale III*, our supreme court expressly declined to hold that the term "beneficial use" as it is used in A.R.S. § 9–463.05 is a rigid construct that requires "the benefit to be based on 'locked in' or unchangeable plans." 187 Ariz. at 484, 930 P.2d at 998. Distinguishing special assessments from development fees, the *Scottsdale III* court noted that in A.R.S. § 9–463.05, the Legislature chose not to require a municipality to produce "preliminary plans that show the location and the type and character of the proposed improvements and estimates of the cost and expenses" associated with future services to be funded through impact fees. *Id.* at 483, 930 P.2d at 997 (quoting A.R.S. § 48–577). It noted that the omission of such limiting language demonstrated the Legislature's affirmative decision not to require concrete plans to support the imposition of an impact fee. *Id.* Instead the court concluded that a more flexible approach

---

5. Expenditures used by a city to promote tourism include cultural exhibits. A.R.S. § 9– 500.06(C)(1).

would allow cities to deal with particular issues as they arise—"[t]o require more fixed and certain plans would make it difficult, if not impossible, to prepare in advance for the consequences of continued growth." *Id.*

¶ 19 While Mesa may not have a specific plan for the use of its cultural facilities development fee, there is sufficient evidence that its intended use complies with the statute. In its General Plan, Mesa indicates the purpose of the cultural facilities is to "enhance the quality of life and promote education regarding the City's historical and artistic legacy." With respect to the development fee, the city imposed the cultural facilities fee "to ensure that new residential development pays its fair share of the capital costs to maintain the current level of service of cultural facilities provided by the City." To that end, Mesa paid an independent third-party consultant to conduct a comprehensive study to determine, in part, the projected impact of new development on the demand for these facilities. The study found that the current cost of existing cultural facilities was roughly $36.5 million. The maximum cost per dwelling unit was $221, which was determined by dividing the cost of existing facilities by the existing number of service units. The study then projected the net revenue that such a fee would generate, based on recent new building permit trends.

¶ 20 Through the study, Mesa provided a sufficiently detailed accounting of how it determined the amount of the fee, as well as the purpose for which it was generated. Moreover, any projections made in the study will be revisited, as Mesa generally conducts a new study every two to three years and makes adjustments to the development fees as needed. We conclude that the level of detail provided in the study is sufficient to demonstrate "a good faith intent to use development fees to provide those services within a reasonable time." *Scottsdale III,* 187 Ariz. at 484, 930 P.2d at 998.

A. *Beneficial Use*

¶ 21 HBA argues that Mesa's cultural facilities development fee fails to comply with the "beneficial use" requirement of A.R.S. § 9–463.05(B)(1) because Mesa did not specify how the cultural facilities fee would provide a benefit to a particular development. Because all of the existing cultural facilities are located in west Mesa and most new development is located in the eastern part of the city, HBA contends that the new development may realize little or no benefit. It also argues that Mesa's "generic conclusory findings" that such fees would benefit new development do not constitute a factual basis sufficient to satisfy A.R.S. § 9–463.05(B)(1).

¶ 22 Municipalities are entitled to deference concerning whether a development fee will result in a "beneficial use." *Scottsdale I,* 179 Ariz. at 11, 875 P.2d at 1316. "If the municipality can show that its plans, calculations and predictions are not 'clearly erroneous, arbitrary, and wholly unwarranted,' we will defer to its judgment and uphold an ordinance as satisfying the broad requirements of section 9–463.05." *Id.* at 10, 875 P.2d at 1315.

1. Direct Benefit

¶ 23 Pursuant to A.R.S. § 9–463.05(B)(1), development fees must result in a beneficial use to the development. Accordingly, the fee "imposed on the developer [must] be factually related to the need for public services created by the proposed development." *Scottsdale III,* 187 Ariz. at 483, 930 P.2d at 997. But while the necessary capital improvements must be foreseeable, they need not be immediate. *Id.* at 484, 930 P.2d at 998. "The municipality is not required to have specific plans that must, by necessity, yield specific results to a specific development within a given period of time before it may assess development fees." *Scottsdale I,* 179 Ariz. at 12, 875 P.2d at 1317.

¶ 24 The fact that a development fee need not provide a direct benefit was addressed in Mesa's findings in support of its imposition of the cultural facilities development fee. The city found that "[t]he types of improvements to each type of public facility ... will benefit all new development in the City, and *it is therefore appropriate to treat the entire City as a single service area* for purposes of assessing, collecting, and expending the impact fee for each type of facilities."

We note that even if Mesa had multiple districts, it would be contrary to the holdings in *Scottsdale I* and *III* to require the city to demonstrate how each new development would benefit from the cultural facilities fees.

### 2. Factual Support

¶ 25 HBA next contends that Mesa's determination that new developments will benefit from the cultural facilities development fee is without factual support, and without such support there is no presumption of validity. HBA is correct that in the absence of factual support for a city's legislative decision to impose a development fee, there is no presumption of validity. *Scottsdale III*, 187 Ariz. at 482, 930 P.2d at 996. But when, as here, a legislative decision is supported by some facts, we will not second-guess its wisdom. *See id.*

¶ 26 Mesa provided findings to support its imposition of the cultural facilities impact fee. It found that the city was experiencing population and employment growth, which created a demand for new residential and nonresidential development. As a result of this growth, many existing public facilities would be overburdened by the increase in demand for public services. These findings were based, in part, on the results from the detailed study that the city commissioned. The study examined the impact of new development on existing Mesa cultural facilities, and found, *inter alia*, that "[t]he demand for cultural facilities, like parks, is generally attributed exclusively to residential development."

¶ 27 Additionally, the Building Safety Director for the City of Mesa ("Director") testified that without the development fee, Mesa "will not have the revenue to complete the new facilities that will be necessary to maintain [the] current level of service . . . creating a burden and hardship on the existing residents [that is] created by the new residents . . . associated with the new development." We conclude that there was sufficient factual support for Mesa's legislative findings. And because HBA has offered no substantial contrary evidence to rebut the presumption of validity, we will not interfere with the legislative determination that cultural facilities benefit new development.

### B. *Reasonable Relationship*

¶ 28 Next, HBA contends that because Mesa did not determine who patronizes Mesa's existing cultural facilities, or whether the facilities are operating at or below capacity, the city cannot establish that the amount of the fee bears a reasonable relationship to the burden of providing additional necessary services.

¶ 29 A.R.S. § 9–463.05(B)(4) requires that "the nature and extent of the exaction must bear a reasonable relationship to that portion of the public burden created by the proposed development." *Scottsdale III*, 187 Ariz. at 483, 930 P.2d at 997 (citing *Jordan v. Vill. of Menomonee Falls*, 28 Wis.2d 608, 137 N.W.2d 442, 447–49 (1965)). "A challenge to the 'reasonable relationship' requirement could be premised upon a municipality's failure to actually account, in some meaningful way, for future revenues to be paid by a development property owner and applied to the growth-related capital costs on which impact fees were calculated." *Home Builders Ass'n of Cent. Ariz. v. City of Goodyear*, 223 Ariz. 183, 196, ¶ 14, 221 P.3d 384, 387 (App.2009) (citing *Scottsdale I*, 179 Ariz. at 12, 875 P.2d at 1317). But a city need only demonstrate "some rational basis for setting the amount of the fee in order to avoid it being clearly erroneous, arbitrary, and wholly unwarranted." *Scottsdale I*, 179 Ariz. at 10, 875 P.2d at 1315.

¶ 30 The Director testified that the "reasonable relationship" requirement was satisfied by comparing the current level of service provided with incremental elements of growth: "[E]very incremental additional new element, single-family residence, commercial property that adds to the demand on the services[ ] is directly proportional to" the initial burden imposed on the city to provide the current level of services. As the study indicated, to maintain the current level of services for cultural facilities, the maximum net cost per residential unit was $221. Because there is substantial evidence that the demand for services is directly proportional to the incremental increases in new develop-

ment, we find no ground upon which to disturb the city's determination of the proper development fee.

¶ 31 In addition to calculating the cost per dwelling unit required to sustain current levels of services for cultural facilities, Mesa also forecast future sources of revenue to be derived from taxes and grants. The study considered the potential for outside funding that could cover a portion of growth-related costs, noting that Mesa financed the new Mesa Arts Center with donations and funds from sales tax. Accordingly, it did not include the Mesa Arts Center in its calculations to determine the existing level of services. In addition, the city took into consideration the fact that it recently received outside funding through grants to enhance museum collections. But because such grants are not guaranteed, no credit adjustments against the cultural facilities development fee were included to determine the amount of the fee. As the statute requires, the city considered other sources of future revenue to determine the extent of the burden to ensure it was proportional to the benefit.

¶ 32 In the absence of any substantial evidence rebutting the presumption of the validity of the legislative decision to impose the fee, we conclude that the analysis contained in the study provides "some rational basis" for Mesa to set the cultural facilities development fee at $217 per residential unit. Accordingly, the amount of the fee was not "clearly erroneous, arbitrary, and wholly unwarranted." *Scottsdale I*, 179 Ariz. at 10, 875 P.2d at 1315.

### CONCLUSION

¶ 33 Because Mesa's cultural facilities are rationally related to the powers granted to it by the Legislature, and because the city has traditionally provided such services to its residents, we hold that they are necessary public services within the meaning of A.R.S. § 9–463.05. We further conclude that Mesa's legislative determination that new development would benefit from the development fee was supported by evidence, and that there was a reasonable relationship between the amount of the development fee and the burden to provide additional necessary services. We therefore affirm.

CONCURRING: MARGARET H. DOWNIE, Presiding Judge, and DONN KESSLER, Judge.